1
2
3
4
5
6
7

8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANTHONY GASTON,                     No. CIV S-03-1707-LKK-CMK-P

12            Plaintiff,

13       vs.                             <u>FINDINGS AND RECOMMENDATIONS</u>

14   EDWARD CADEN, et al.,

15            Defendants.

16   _____/

17           Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18   to 42 U.S.C. § 1983.   Pending before the court is defendants' motion for summary judgment

19   (Docs. 97, 98, 99, 100, 101, 102, and 103).  Plaintiff filed an opposition (Doc. 119), and

20   defendants filed a reply and supplemental supporting documents (Docs. 128, 129, 132, and 133).

21   Also before the court are:  (1) plaintiff's cross-motion for summary judgment (Doc. 119);

22   (2) defendants' motion to strike (Doc. 127) plaintiff's cross-motion for summary judgment;

23   (3) defendants' objections (Docs. 130 and 131); and (4) defendants' request for judicial notice

24   (Doc. 134).

25   / / /

26   / / /

1

As to plaintiff's cross-motion for summary judgment and defendants' related motion to strike, defendants argue that plaintiff's cross-motion should be stricken because it is untimely.  Specifically, they cite the court's April 23, 2007, amended scheduling order which required that all dispositive motions be filed by August 17, 2007.  Defendants conclude that, because plaintiff's cross-motion for summary judgment was not filed until December 26, 2007, it is untimely.  The court agrees.  Defendants' motion to strike should be granted and plaintiff's cross-motion for summary judgment should be stricken.  The court will consider plaintiff's December 26, 2007, filing (Doc. 119) to the extent it is an opposition to defendants' motion for summary judgment.

In their request for judicial notice, defendants ask the court to take judicial notice of the state court abstract of judgment relating to petitioner's commitment offense.  The court should decline to do so because plaintiff's commitment offense is not relevant to the instant action in which plaintiff raises civil rights claims relating to the conditions of his confinement. Defendants have offered no argument as to why the abstract of judgment is relevant in this case.

## I.  BACKGROUND

This action proceeds on the second amended complaint (Doc. 30) against defendants Caden, Aguirre, Haley, Manuel, and Prebula.[1]

### A.      Plaintiff's Allegations[2]

Plaintiff, who is disabled and confined to a wheelchair, alleges that in July 2000 he had been threatened and that he believed his life was in danger.  He states he reported this threat and his "enemy concern" to correctional officer Milliner.  (Complaint, ¶ 19).  Plaintiff claims that, "around the same time," defendant Caden was "soliciting a campaign" to have

---

[1]      All other defendants named in the second amended complaint have been dismissed.

[2]      The court will focus on the allegations relating to the remaining defendants.

2

plaintiff killed by labeling him a snitch and telling other inmates that he "filed too many 602's and law suits."[3]  (id. at ¶ 21).  Specifically, plaintiff asserts:

> It is fact that Defendant Caden attempted to pay inmates to kill Plaintiff, various inmates were offered drugs, appliances (e.g., TV's, CD players, radio's, shows, and other incentives, such as a pass to get out of the hole any time they got in trouble). . . .  Defendant Caden wanted to have plaintiff killed.

(id. at ¶ 22).

He also states that defendant Caden acted with "intent to have Plaintiff's documented enemy personally assault plaintiff . . . ."  (id. at ¶ 23).  Plaintiff claims that defendant Caden set up a "gladiator styled event" by releasing inmate Woods "to mainline" on or about August 29, 2000, which "caused Plaintiff to suffer a paranoia psychotic episode resulting in a Medieval fight between Plaintiff and Woods."  (id. at ¶ 25).

Plaintiff next claims:

> On 9-5-01, defendant Aguirre "carried out a telegraphed plot to conspire, collude, aid and abet to unlawfully deny and deprive Plaintiff equal protection and due process when [defendant] Aguirre intentionally refused to follow routine standard practices, procedures, and protocols dealing with safety and security of the institution when defendant Aguirre illegally placed Plaintiff in the hole on a whim of false, erroneous, information under the guise that Plaintiff's life was in danger, defendant Aguirre falsified documents against Plaintiff, treating Plaintiff differently from similar situated individuals by failing to lock up the predators who conspired to assault/kill Plaintiff and charge them with disciplinary 115's.

(id. at ¶ 29).

Plaintiff claims this resulted in his "false imprisonment" in administrative segregation for approximately two years.  (id.).  According to plaintiff, defendant Caden and others denied plaintiff the opportunity to call witnesses at a disciplinary hearing.  (id. at ¶ 42).

///

///

---

[3]     "602's" refers to inmate grievances.

As to defendant Prebula, plaintiff asserts:

. . . [O]n April 2000 [correctional officer] Valdez worked in concert with defendant Prebula to cover up the review and investigation in Plaintiff's 602 appeal challenging that . . . disclosure forms were falsified and manufactured solely for the purpose of retaliation and punishment.

(id. at ¶ 46).

Plaintiff claims that defendant Prebula's actions were intended to hide the truth that defendants Caden and Aguirre had ". . . direct personal relations, and contact with gang members who they solicited and relied upon when ever they needed I/M henchmen to do their dirty work." (id. at ¶ 47).

As to defendant Haley, plaintiff claims:

On 9-10-02 defendant Haley afforded plaintiff an Olson review[4] which was for the sole purpose of retaining copies from Plaintiff C-file. However one of the documents Plaintiff sought to have copied was the 7-31-00 enemy chrono verifying that Plaintiff did in fact fear for his life with the enemy situation.  However, on 9-20-02, defendant Haley willfully, intentionally, and maliciously deprived Plaintiff access to the requested copies specifically 128 enemy chrono to cover up collude, conspire, aid and abet and work in concert in the ongoing conspiracy plot to murder Plaintiff.  Defendant Haley knew or should have known that Plaintiff should not have been denied relevant copy's [sic] from C-file simply because Plaintiff was indigent.. . . .  Defendant Haley's motive was exercised with ill-will, malice and the intent to cover up, conceal, and/or destroy the 128 enemy chrono.  Defendant Haley presented knowingly false information that is consistent with the . . . code of silence, specifically carried out to cause Plaintiff harm.

(id. at ¶ 51).

As to defendant Manuel, plaintiff claims:

On 10-7-02 defendant Manuel in his individual and official capacity willfully failed to correct, reverse, and/or intervene in the conspiratorial cover up, and wrong doings exercised and practiced by [prison officials] and specifically the actions of defendant Haley. Defendant Manuel reviewed and recklessly disregarded said actions when Plaintiff is informed had equal access to Plaintiff's C-file, and therefore knew or should have known of the ongoing historical pattern of illegal

---

[4]    According to defendants, an "Olson review" is an annual review of a prisoner's central file mandated by In re Olson, 37 Cal.App.3d 783 (1st Dist. 1974).

4

conduct against Plaintiff . . . .   Defendant Manuel took part in the "Green
Wall" cover up that was consequently resulted in the intentional removal,
destruction, and/or altering of enemy chrono dated 7-31-00 subjecting
Plaintiff to deliberate indifference.

(id. at ¶ 52).

Plaintiff alleges that defendants' conduct resulted in cruel and unusual

punishment, retaliation, due process violations, and equal protection violations.

Attached to plaintiff's complaint are the declarations of inmates Freeman,

Howard, and Kelly.  Inmate Freeman states:

Sometime during the month of August 2000, associate warden
Edward J. Caden told me that he had an ass hole prisoner on the (CMF)
mainline who was a known snitch. . . .  He said prisoner Gaston . . . was
constantly filing frivolous lawsuits and causing trouble. . . .  Caden
solicited me to work for him to assault or kill inmate Gaston, or if I would
incite other prisoners to assault or kill prisoner Gaston. . . .  Caden
promised that he would reward me or the other prisoners with T.V.'s,
C.D.'s marijuana, lighters, monthly canteen, new shoes, knives and would
ensure that whoever carried out his campaign to assault or kill prisoner
Gaston would not have to worry about ever doing a SHU or long stays in
(ad-seg), that if we ever got in trouble to have any staff contact him
personally and he would get us out of trouble.

Inmate Howard states:

On or about August 29, 2000, inmate Woods . . . approached me
and told me he was just released from (ad-seg) as a favor from Edward J.
Caden the former associate warden at (CMF), presently the chief deputy
warden at (SVSP).  Inmate Woods continued speaking by asking me for a
favor, Woods said he needed help from the 'Crips' to assault and/or kill
prisoner Gaston.  When I inquired what for?  Wood's [sic] stated that . . .
Caden said Gaston was a prison snitch/rat. . . .  Woods told me to think
about it, and talk to the Crips, he said that he would talk to other Crips to
help Caden hire prisoner's to assault or kill Gaston. . . .

Inmate Kelly states:

Anthony Gaston . . . is a personal friend of mine, he is confined to
a wheelchair, he is mostly humble and respectful with and around other
inmates, their [sic] is no truth to the rumor that his life is in danger, he has
assisted many individuals with legal work and is well liked.
Myself being associated with the Crips, me nor any of my homies
would allow any thing to happen to Anthony Gaston.

**B.    Undisputed Facts**

Initially, the court notes that defendants' characterization of plaintiff's allegations against them is somewhat more limited than would be suggested by the allegations actually stated in the second amended complaint.  With this in mind, defendants assert that a number of facts – most of which are based on statements made by plaintiff at his deposition – are undisputed:[5]

Facts Relating to Defendant Caden

1.    Plaintiff informed defendant Caden that he had an enemy concern but, at that time, did not say that the enemy concern involved inmate Woods;

2.    Plaintiff requested that Milliner – plaintiff's correctional counselor – document his enemy concern by placing inmate Woods on plaintiff's enemy list;

3.    The confidential portion of plaintiff's prison central file contains a "CDC 128B chrono" completed by Milliner indicating that, on July 31, 2000, plaintiff requested that Woods be placed on his enemy list, but that plaintiff stated at the time that Woods had never threatened him with a razor and that plaintiff did not feel threatened by Woods;

4.    Following plaintiff's report to Milliner, inmate Woods was placed in administrative segregation on July 31, 2000, or August 1, 2000, and later released on or about August 29, 2000;

5.    Plaintiff learned of Woods' release from administrative segregation the same day Woods was released;

6.    Plaintiff remained concerned for his safety with respect to Woods but did not report his continuing safety concern;

7.    After learning that Woods had been released from administrative segregation, plaintiff fabricated a weapon by placing a can of chili in a sock;

8.    According to a prison incident report, on August 30, 2000, plaintiff approached Woods from behind in the dining hall and swung the chili/sock weapon at Woods three times;

---

[5]    Defendants' statement of undisputed facts is also supported by the declaration of Heidi Vervoort, who is the Case Records Manager at Kern Valley State Prison.  Ms. Vervoort's declaration is signed under penalty of perjury as to the truth of the matters stated therein. Attached to her declaration are various documents, which Ms. Vervoort authenticates in her declaration.  Defendants' statement is also supported by the declaration of defendant Aguirre, signed under penalty of perjury as to the truth of the matters stated.

9.      While plaintiff states that he cannot recall the incident, he also states that he has no reason to believe that the prison incident report is not true;

10.     Plaintiff responded to the rules violation report resulting in the administrative segregation placement as follows:

> When I heard the rumor that Woods was back on the mainline, I became extremely afraid with fear, paranoid and my mental condition relapsed into a state of psychosis at which time I started hearing voices again.  The voices then told me to try and defend myself by placing a can into the sock only for self-defense.  But when I later seen inmate Woods in the chow hall, I became to afraid that I heard voices that I was God, that inmate Woods was the devil, that Armageddon was at hand, and that I needed to prevent the devil from destroying my kingdom. . . .  I did not willfully try to hurt or cause harm to inmate Woods.

11.     Defendant Caden supervised the hearing relating to the rules violation report issued following plaintiff's assault on Woods;

12.     Plaintiff's request for witnesses at the hearing on the rules violation report was denied because neither of the requested witnesses were present at the time of the incident;

13.     Plaintiff was placed in administrative segregation on August 30, 2000, as a result of the dining hall incident with Woods;

14.     When plaintiff's term in administrative segregation ended in May 2001, he could not be released because, by that time, Woods had listed plaintiff as an enemy;

15.     Plaintiff and inmate Woods resolved their enemy issues on August 13, 2001;

16.     Plaintiff was approved for release from administrative segregation on August 22, 2001, but he refused to leave;

17.     Plaintiff ultimately left administrative segregation on September 2, 2001;

Facts Relating to Defendant Aguirre

1.      A "CDC 1030" form was issued to plaintiff indicating confidential information revealed that plaintiff's safety may be in jeopardy if he remained on the "CMF mainline";

2.      This form specifically indicated that "[t]he reliability of the source is yet to be determined";

3.      The form indicated that a confidential memorandum would be authored by defendant Aguirre and placed in plaintiff's C-file;

7

4.       A September 5, 2001, "Inmate Segregation Profile" form indicated that plaintiff "may have possible issues with Crips";

5.       Plaintiff was placed in administrative segregation by defendant Aguirre on September 5, 2001, for his protection as a result of the confidential information indicating a threat to his safety;

6.       After the initial information had been corroborated, another CDC 1030 confidential information form was dated March 20, 2002, indicating that plaintiff's safety would be in danger if he remained on the mainline;

7.       Plaintiff was retained in administrative segregation through July 2003;

8.       Plaintiff concedes that defendant Aguirre placed him in administrative segregation based on a credible threat to his safety, but contends that "the way they went about carrying out the act itself was in violation."

In addition to the statement of undisputed facts, defendant Aguirre provides the court with her declaration stating as follows:[6]

1.       Defendant Aguirre received confidential information concerning a threat to plaintiff's safety if he remained in the general population mainline;

2.       Plaintiff was placed in administrative segregation for his safety and not for any improper reasons;

3.       All relevant memoranda and documents were provided to plaintiff;

4.       The confidential source was eventually identified and corroborated by an independent source;

5.       Defendant Aguirre had no reason "to be concerned" with the administrative grievances or lawsuits filed by plaintiff and, to the best of defendant Aguirre's knowledge, none mentioned her; and

6.       Defendant Aguirre did not retaliate against plaintiff or conspire with anyone to deprive plaintiff his civil rights.

Facts Relating to Defendant Haley

1.       Defendant Haley afforded plaintiff an Olson review, at which time plaintiff requested copies of documents;

2.       Defendant Haley denied the request for copies because plaintiff did not have money in his prison trust account to pay for the copies;

---

[6]       No other defendants provide the court with their declarations.

8

3.     Pursuant to prison regulations, plaintiff was not permitted to review portions of his central file designated as confidential.

### Facts Relating to Defendant Prebula

1.     Plaintiff filed an inmate grievance concerning his September 2001 placement in administrative segregation;

2.     Defendant Prebula processed this grievance at the second level of review.

### Facts Relating to Defendant Manuel

1.     Plaintiff filed an inmate grievance concerning his Olson review;

2.     Defendant Manual screened plaintiff's inmate grievance out at the director's level because it had been granted at a lower level;

3.     Defendant Manuel never saw the substance of plaintiff's inmate grievance because it was screened out for a procedural reason.

### Facts Relating to Defendants' Knowledge of Plaintiff's Grievances and Lawsuits

1.     A visiting medical technical assistant – Brommel – spoke negatively to officials at plaintiff's prison about plaintiff and told them that plaintiff had filed inmate grievances and lawsuits;

2.     Plaintiff admits he has no evidence that defendant Caden ever learned of the substance of Brommel's comments;

3.     Plaintiff admits he has no evidence that defendant Caden ever actually spoke with Brommel about plaintiff's lawsuits and grievances;

4.     Defendant Aguirre never learned of the substance of Brommel's comments;

5.     Neither defendants Caden nor Aguirre were ever named in any of plaintiff's prior lawsuits;

6.     Other than Brommel's statements to prison staff other than Caden and Aguirre, plaintiff has no evidence that these defendants actually knew of Brommel's statements concerning plaintiff's grievances and lawsuits;

7.     Plaintiff has no evidence that defendants Prebula, Haley, and Manuel ever learned of the statements made by Brommel.

///

///

9

1    Turning to plaintiff's opposition, while plaintiff states that he disputes a number

2  of the facts outlined above, he does not point to specific evidence to show that a dispute actually

3  exists.  For example, in his statement of disputed facts, plaintiff states that he disputes "[w]hether

4  Plaintiff told Caden that he had an enemy concern that he wanted to address . . . about Woods, if

5  Caden interrupts & redirects Plaintiff to his counselor, and fails to inquire as to who the enemy

6  concern was with."  Plaintiff, however, does not provide the court with any evidence

7  contradicting defendants' statements of undisputed facts.  This is the pattern for all of plaintiff's

8  "disputed facts."  Moreover, the vast majority of undisputed facts outlined by defendants are

9  based on plaintiff's own testimony offered at his July 20, 2007, deposition, which he cannot

10  escape by simply stating that he now disputes the testimony.  Plaintiff's deposition testimony,

11  given under oath, is competent evidence upon which defendants are entitled to rely upon.

12    The court turns next to plaintiff's declaration offered in opposition to defendants'

13  motion for summary judgment, as to which defendants raise a number of objections.  In

14  particular, the court notes the following:

15    1.    Plaintiff's Statement:  Plaintiff states that, in 2002, he asked inmate
         Manuel Perry to "look into the situation" of whether plaintiff's life was in
16         jeopardy if he were placed in the general population and that Perry
         "reported the situation was negative."  He also states that defendants and
17         their agents "painted a picture" to general population inmates that plaintiff
         was afraid to return to the general population and that this was the reason
18         he remained in administrative segregation.

19         Defendants' Objections:  Defendants object that this statement is
         speculation and hearsay.  The court agrees.  To the extent plaintiff states
20         that defendants "painted a picture" to general population inmates, this
         must be speculation because plaintiff was not in the general population at
21         the time; he was in administrative segregation.  In addition, to the extent
         plaintiff offers the out-of-court statements of inmate Perry for the truth of
22         the matters stated by Perry – i.e., that plaintiff would be safe in the general
         population – the statement is inadmissible hearsay.

23
24    2.    Plaintiff's Statement:  Plaintiff states that "[i]t is a fact that inmate Woods
         told plaintiff that Caden was the chairperson of the (ICC) panel that
25         released him (i.e., Woods) to the mainline on or around 8-29-00."

26  ///

<u>Defendants' Objection</u>:  Defendants object that this statement is hearsay. The court agrees.  It is clear that plaintiff is offering inmate Woods' out-of-court statement for the fact of the matter stated – that defendant Caden was the chairperson of the panel that released inmate Woods to the general population in August 2000.

Plaintiff's declaration also contains a number of irrelevant statements as well as statements which contradict his earlier deposition testimony.  The court agrees with defendants that plaintiff cannot create a disputed fact merely by offering a declaration in opposition to summary judgment which contradicts previous sworn deposition testimony.  <u>See</u> <u>Kennedy v. Allied Mutual Ins. Co.</u>, 925 F.2d 262, 266-67 (9th Cir. 1991).

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

. . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

 "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as

1    whatever is before the district court demonstrates that the standard for entry of summary

2    judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

3                 If the moving party meets its initial responsibility, the burden then shifts to the

4    opposing party to establish that a genuine issue as to any material fact actually does exist. See

5    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

6    establish the existence of this factual dispute, the opposing party may not rely upon the

7    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

8    form of affidavits, and/or admissible discovery material, in support of its contention that the

9    dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

10   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

11   of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

12   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

13   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

14   for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

15                In the endeavor to establish the existence of a factual dispute, the opposing party

16   need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

17   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary

19   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

20   genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

21   committee's note on 1963 amendments).

22                In resolving the summary judgment motion, the court examines the pleadings,

23   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

24   any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See

25   Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed

26   before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

1   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

2   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

3   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

4   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

5   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

6   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

7   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

8

9                                    **III.  DISCUSSION**

10              Based on the allegations as outlined in the second amended complaint, plaintiff

11   appears to raise the following claims:  (1) an Eighth Amendment safety claim based on an

12   allegedly staged "gladiator fight" with inmate Woods; (2) a due process claim based on allegedly

13   improper procedures followed at the disciplinary hearing relating to plaintiff's assault on inmate

14   Woods; (3) an equal protection claim based on plaintiff's September 2001 placement in

15   administrative segregation; (4) a due process claim based on the alleged removal and/or

16   concealment of documents from his central file during an Olson review; (5)  a due process claim

17   based on failure to properly investigate his inmate grievance concerning his September 2001

18   placement in administrative segregation; (6) a due process claim based on failure to properly

19   investigate his inmate grievance concerning documents requested at his Olson review; and

20   (7) retaliation claims.

21              At his deposition, plaintiff provided testimony concerning the alleged factual

22   bases of these claims with respect to each defendant.

23              Caden – Plaintiff testified  that "reliable sources" (inmates Freeman and Howard)

24   came to him and informed plaintiff that "inmate Woods was going around trying to spread a

25   campaign to have me assaulted or killed."  Plaintiff added that these witnesses told him that

26   "Caden was trying to solicit a campaign to have me assaulted or killed" by Woods.  He also

states that Woods informed him that defendant Caden was a member of the panel that decided to release Woods to the general population. Plaintiff stated that these are the only reasons he believed Caden was trying to arrange a fight between plaintiff and Woods. As to the rules violation hearing arising from the incident with inmate Woods, plaintiff testified that defendant Caden improperly denied his request for witnesses at the hearing. Plaintiff further testified that he believed that Caden also acted in retaliation for his having filed inmate grievances and lawsuits in the past. He stated that Caden was made aware of his prior grievances and lawsuits through Brommel's negative statements about plaintiff to other correctional officers.

Aguirre – Plaintiff testified that he believes the September 2001 administrative segregation placement authorized by defendant Aguirre violated his civil rights because the confidential information was insufficient. He testified that he was being treated differently than other similarly situated individuals. Specifically, he stated that there was confidential information alleging that inmate Pavich threatened to assault another inmate and that Pavich was placed in administrative segregation. He compared this situation to his case where, instead of Woods, plaintiff was placed in administrative segregation. Plaintiff testified:

> And my case, I was the one that was allegedly being threatened where my life was supposedly supposed to be in danger, and instead of the individuals that were perpetrating the crime, they were allowed to remain on the main line while they retained me in Ad. Seg.

Plaintiff further testified that he did not believe that there was any credible threat to his safety to justify his administrative segregation placement in September 2001. It also appears that plaintiff testified that he believes defendant Aguirre's conduct was retaliatory.

/ / /
/ / /
/ / /
/ / /
/ / /

1     <u>Haley</u> – Plaintiff testified that he believes defendant Haley had "something to do

2 with the chrono [documenting the enemy concern regarding Woods] disappearing out of my C

3 file." He also testified that defendant Haley was aware of the 2000 fight with inmate Woods. As

4 to defendant Haley, the following exchange took place at plaintiff's deposition:

5         Q:    Okay. So just to recap and make sure I've got this correct.
Your claims against Haley at this time are limited to his denial of copies of

6 your C file, and your belief that he may have been responsible for the
disappearance or removal of your . . . inmate concern against Woods from

7 your central file?

8         A:    Yes, that's correct.

9     <u>Prebula</u> – Plaintiff testified that, with respect to his inmate grievance over his

10 September 2001 administrative segregation placement based on confidential information,

11 defendant Preblua failed to investigate his grievance. According to plaintiff, ". . . Prebula had a

12 duty to review that information and be neutral and non-biased, but I believe that he failed to do

13 so when he failed to follow up on the information and the leads I had provided him during our

14 interview." Plaintiff added that defendant Preblua failed to provide him with due process with

15 respect to his inmate grievance.

16     <u>Manuel</u> – As to defendant Manuel, the following exchange took place at

17 plaintiff's deposition:

18         Q:    . . . [¶] My question is, what are you alleging that Manuel
did that violated your rights?

19

20         A:    Well, the director of corrections, which is the third level of
review dealing with the inmate grievance system, they have an obligation

21 to look at the third level appeals and to determine whether those appeals
are wrongly denied or, in my case, the whole situation was manipulated

22 when they granted my appeal, but failed to produce the evidence that I was
seeking. So that was like manipulation of the appeals process, which I

23 addressed in my appeal.
And for Manuel or anybody that works on the third level review to

24 simply screen the appeal out based on a blanket answer that was provided
by lower level, which still deprives the inmate of the rights that he's

25 seeking, that right there is a violation of due process as well because his
job is to oversee what's going on. And if he failed to do that and screen

26 our an appeal, then basically that deprives the inmate of any protection or
privilege to resolve any potential problems that he may have.

15

\* \* \*

Q:      Okay.  And other than this denial of your third level appeal, did he do anything else that you felt was wrongful?

A:      No, ma'am.

Based on the allegations in the complaint, as clarified by plaintiff at his deposition, the court concludes that this case presents claims arising from three events:  (1) the incident with inmate Woods in August 2000; (2) plaintiff's September 2001 placement in administrative segregation; and (3) plaintiff's attempt to copy documents from this central file during an Olson review.  Specifically, plaintiff claims the 2000 incident was staged by defendant Caden, in violation of his Eighth Amendment rights.  He also claims that defendant Caden denied him the opportunity call witnesses at the disciplinary hearing arising from the incident, in violation of his due process rights.  As to his placement in administrative segregation in September 2001, plaintiff claims defendant Aguirre essentially manufactured confidential information to justify the placement, in violation of his equal protection and due process rights. He also claims that both incidents were motivated by a desire on the part of defendants Caden and Aguirre to retaliate against plaintiff because he had filed inmate grievances and lawsuits.  As to the Olson review plaintiff claims defendant Haley improperly removed and/or concealed documents, in violation of his due process rights. Finally, with respect to defendants Prebula and Manuel, plaintiff asserts that they violated his due process rights by failing to adequately review his grievances concerning the September 2001 administrative segregation placement and Olson review.

A.      **Eighth Amendment Claim**

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

16

1   of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

2   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

3   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

4   "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

5   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only

6   when two requirements are met: (1) objectively, the official's act or omission must be so serious

7   such that it results in the denial of the minimal civilized measure of life's necessities; and (2)

8   subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

9   inflicting harm. See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

10  official must have a "sufficiently culpable mind." See id.

11          Under these principles, prison officials have a duty to take reasonable steps to

12  protect inmates from physical abuse. See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir.

13  1982); Farmer, 511 U.S. at 833.  To demonstrate that a prison official was deliberately indifferent

14  to a safety risk, the prisoner must establish that the official knew of the risk but disregarded it.

15  See Farmer, 511 U.S. at 837.  The very obviousness of the risk may suffice to establish the

16  knowledge element. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  Prison officials

17  are not liable, however, if evidence is presented that they lacked knowledge of a safety risk. See

18  Farmer, 511 U.S. at 844.

19          Plaintiff claims defendant Caden set up the August 2000 incident with Woods.  In

20  support of this claim, plaintiff offers the declarations of inmates Freeman and Howard.  Inmate

21  Freeman states that he was solicited by defendant Caden to assist with a "campaign" to have

22  plaintiff either assaulted or killed.  According to inmate Howard, he was told by Woods that

23  Caden had solicited Woods to participate in this plan.  Both inmates suggest that Caden's

24  motivation was to eliminate a "snitch" – someone who had filed grievances and lawsuits.

25  / / /

26  / / /

1    Defendants argue that plaintiff "cannot establish that any violation occurred,

2    much less a sufficiently serious violation."  The court agrees that no Eighth Amendment

3    violation occurred.  Setting aside the obvious hearsay problems with the Freeman and Howard

4    declarations, and accepting for the sake of argument that defendant Caden did in fact solicit other

5    inmates to attack plaintiff, the undisputed facts in this case establish that it was plaintiff who

6    attacked Woods.  More to the point, there is no evidence that any inmate ever attacked plaintiff

7    as part of Caden's alleged plot to eliminate him.  In other words, even if defendant Caden had in

8    fact solicited other inmates to attack plaintiff, none did.

9    Further, to the extent plaintiff alleges an Eighth Amendment violation on the

10   theory that defendant Caden was deliberately indifferent to a risk to plaintiff's safety posed by

11   Woods' release to the general population, plaintiff cannot prevail because, again, the facts

12   establish that he was the one who assaulted Woods, not the other way around.  Plaintiff was the

13   one who created the risk to his safety, not defendant Caden.  Moreover, plaintiff cannot prove

14   that defendant Caden knew of the alleged risk posed by Woods.  While the court accepts that

15   plaintiff informed defendant Caden that he had an enemy concern, by plaintiff's own admission

16   at his deposition, he did not mention Woods to defendant Caden at the time.  Instead, he first

17   mentioned Woods to his correctional counselor Milliner, who placed the enemy documentation

18   in plaintiff's file and took steps to separate plaintiff from Woods.

19   **B.    Equal Protection Claims**

20   Equal protection claims arise when a charge is made that similarly situated

21   individuals are treated differently without a rational relationship to a legitimate state purpose.

22   See San Antonio School District v. Rodriguez, 411 U.S. 1 (1972).  Prisoners are protected from

23   invidious discrimination based on race.  See Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

24   Racial segregation is unconstitutional within prisons save for the necessities of prison security

25   and discipline.  See Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam).  Prisoners are also

26   protected from intentional discrimination on the basis of their religion.  See Freeman v. Arpaio,

125 F.3d 732, 737 (9th Cir. 1997).  In order to state a § 1983 claim based on a violation of the

Equal Protection Clause of the Fourteenth Amendment, a plaintiff must allege that defendants

acted with intentional discrimination against plaintiff, or against a class of inmates which

included plaintiff, and that such conduct did not relate to a legitimate penological purpose.  See

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (holding that equal protection claims

may be brought by a "class of one"); Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740

(9th Cir. 2000); Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998); Federal Deposit Ins.

Corp. v. Henderson, 940 F.2d 465, 471 (9th Cir. 1991); Lowe v. City of Monrovia, 775 F.2d 998,

1010 (9th Cir. 1985).

Plaintiff's equal protection claim arises from his placement in administrative

segregation between September 2001 and July 2003 by defendant Aguirre.  Defendants' position

is that the placement was motivated by a desire to protect plaintiff from potential threats revealed

by confidential information which was eventually corroborated.  Plaintiff's position is that the

placement was retaliatory (discussed below) and a denial of equal protection because, as the

potential victim, he should not have been punished with a segregated placement.  He contends

the inmates alleged by the confidential informants to have posed the threat should have been the

ones placed in administrative segregation.

Plaintiff cannot prevail because, contrary to his assertion, there was no way the

potential risk to his safety revealed by the confidential source could have been addressed by

leaving plaintiff in the general population.  The undisputed facts reveal that the threat was

generalized in nature and did not relate to a specific inmate who posed a threat.  In particular, the

confidential source indicated generally that plaintiff's life was in danger if he remained in the

general population.  Thus, there was no way for prison officials to do as plaintiff suggests and

place the potential offender in administrative segregation.  Thus, plaintiff's September 2001

placement in administrative segregation served the legitimate penological interests of preventing

a possible incident and protecting plaintiff from possible harm.

1          C.      **Due Process Claims**

2          The Due Process Clause protects prisoners from being deprived of life, liberty, or

3    property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to

4    prevail on a claim of deprivation of due process, a plaintiff must first establish the existence of a

5    liberty or property interest for which the protection is sought.  See Ingraham v. Wright, 430 U.S.

6    651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).  Due process protects against

7    the deprivation of property where there is a legitimate claim of entitlement to the property.  See

8    Bd. of Regents, 408 U.S. at 577.  Protected property interests are created, and their dimensions

9    are defined, by existing rules that stem from an independent source – such as state law – and

10   which secure certain benefits and support claims of entitlement to those benefits.  See id.

11         Liberty interests can arise both from the Constitution and from state law.  See

12   Hewitt v. Helms, 459 U.S. 460, 466 (1983); Meachum v. Fano, 427 U.S. 215, 224-27 (1976);

13   Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).  In determining whether the Constitution

14   itself protects a liberty interest, the court should consider whether the practice in question ". . . is

15   within the normal limits or range of custody which the conviction has authorized the State to

16   impose."  Wolff, 418 U.S. at 557-58; Smith, 994 F.2d at 1405.  Applying this standard, the

17   Supreme Court has concluded that the Constitution itself provides no liberty interest in good-

18   time credits, see Wolff, 418 U.S. at 557; in remaining in the general population, see Sandin v.

19   Conner, 515 U.S. 472, 485-86 (1995); in not losing privileges, see Baxter v. Palmigiano, 425

20   U.S. 308, 323 (1976); in staying at a particular institution, see Meachum, 427 U.S. at 225-27; or

21   in remaining in a prison in a particular state, see Olim v. Wakinekona, 461 U.S. 238, 245-47

22   (1983).

23         In determining whether state law confers a liberty interest, the Supreme Court has

24   adopted an approach in which the existence of a liberty interest is determined by focusing on the

25   nature of the deprivation.  See Sandin v. Connor, 515 U.S. 472, 481-84 (1995).  In doing so, the

26   Court has held that state law creates a liberty interest deserving of protection only where the

1   deprivation in question: (1) restrains the inmate's freedom in a manner not expected from the

2   sentence; and (2) "imposes atypical and significant hardship on the inmate in relation to the

3   ordinary incidents of prison life." Id. at 483-84.  Prisoners in California have a liberty interest in

4   the procedures used in prison disciplinary hearings where a successful claim would not

5   necessarily shorten the prisoner's sentence.  See Ramirez v. Galaza, 334 F.3d 850, 853, 859 (9th

6   Cir. 2003) (concluding that a due process challenge to a prison disciplinary hearing which did not

7   result in the loss of good-time credits was cognizable under § 1983); see also Wilkinson v.

8   Dotson, 544 U.S. 74, 82 (2005) (concluding that claims which did not seek earlier or immediate

9   release from prison were cognizable under § 1983).

10          As discussed above, plaintiff alleges a number of due process aspects to his

11   claims.  Specifically, plaintiff claims:  (1) defendant Caden improperly denied him witnesses at

12   the rules violation hearing arising from the August 2000 incident with Woods; (2) defendant

13   Aguirre improperly placed him in administrative segregation in September 2001; (3) defendant

14   Haley improperly denied him access to documents from his central file during an Olson review;

15   and (4) defendants Manuel and Prebula improperly processed his inmate grievances.

16                    1.    Denial of Witnesses at Rules Violation Hearing

17          With respect to prison disciplinary proceedings which result in the loss of good-

18   time credits, due process requires prison officials to provide the inmate with: (1) a written

19   statement at least 24 hours before the disciplinary hearing that includes the charges, a description

20   of the evidence against the inmate, and an explanation for the disciplinary action taken; (2) an

21   opportunity to present documentary evidence and call witnesses, unless calling witnesses would

22   interfere with institutional security; and (3) legal assistance where the charges are complex or the

23   inmate is illiterate.  See Wolff, 418 U.S. at 563-70.  Due process is satisfied where these

24   minimum requirements have been met, see Walker v. Sumner, 14 F.3d 1415, 1420 (9th Cir.

25   1994), and where there is "some evidence" in the record as a whole which supports the decision

26   of the hearing officer, see Superintendent v. Hill, 472 U.S. 445, 455 (1985).  The "some

21

evidence" standard is not particularly stringent and is satisfied where "there is any evidence in the record that could support the conclusion reached." Id. at 455-56.  However, a due process claim challenging the loss of good-time credits as a result of an adverse prison disciplinary finding is not cognizable under § 1983 and must be raised by way of habeas corpus.  See Blueford v. Prunty, 108 F.3d 251, 255 (9th Cir. 1997).

Plaintiff claims that defendant Caden improperly denied him witnesses at the rules violation hearing arising from the August 2000 incident with Woods.  As to this claim, plaintiff testified at his deposition as follows:

> A:    I requested to have CC Milliner, my counselor, I wanted to call her as a witness to demonstrate that – the enemy concern at that time. And then, too, I wanted to call in the doctor.  I believe her name was –
>
> Q:     Is that Shamasundra?
>
> A:    Correct. . . .
>
> * * *
>
> A:    She was the one that initially seen me and recommended that I be taken to DMH because I suffer blackouts.  And I guess before or during the time of the fight between me and Woods, I had blacked out. And because of bizarre psychotic behavior, she recommended that I be sent to DMH. . . .
>
> * * *
>
> Q:    And were either Milliner or Shamasundra present at the time of the altercation between you and Woods in August 2000?
>
> A:    No.

In response to this claim, defendants argue:

> Here, the denial of Gaston's request for witnesses did not violate his Due Process rights.  The only issue at the disciplinary hearing was Gaston's attack on inmate Woods.  Prison officials reasonably concluded that calling witnesses who were not present at the time of the altercation would not have been helpful to the determination and refused the request. See Davies v. Valdes, 462 F. Supp. 2d 1084, 1093 (C.D. Cal. 2006) (citing Wolff, 418 U.S. at 566, and holding that prison officials can refuse witnesses where they would be irrelevant or unnecessary).

1    The undisputed facts indicate that defendant Caden denied plaintiff's request for

2 Milliner and Shamasundra to appear as witnesses at his hearing because they were not present at

3 the time of the altercation with inmate Woods.  Therefore, as defendants argue, they were not

4 necessary and would not have been relevant to determination of the sole issue – whether plaintiff

5 assaulted inmate Woods.  Correctional counselor Milliner could not have testified to this issue,

6 and his knowledge of plaintiff's report of an enemy concern with inmate Woods is not relevant to

7 plaintiff's culpability for the attack on Woods.  Similarly, plaintiff admits that Dr. Shamasundra

8 was not present during the altercation and, thus could have no personal knowledge of the events.

9 As to plaintiff's assertion that Dr. Shamasundra could have testified that he suffered from

10 blackouts, this would not have been relevant to plaintiff's culpability given his admission in

11 prison documents that he preemptively attacked Woods without provocation.  While plaintiff's

12 mental state might have explained why he attacked Woods, it is not relevant to whether the attack

13 occurred, which was the issue at the rules violation hearing.  Therefore, plaintiff cannot prevail

14 on his due process claim against defendant Caden relating to witnesses at the rules violation

15 hearing.

16                  2.    September 2001 Placement in Administrative Segregation

17    To the extent plaintiff asserts that his September 2001 placement in administrative

18 segregation constituted a violation of due process, plaintiff cannot prevail because there is no due

19 process right in remaining in the general population, see Sandin, 515 U.S. at 485-86, or in not

20 losing privileges, see Baxter, 425 U.S. at 323.

21                  3.    Denial of Documents at Olson Review

22    Plaintiff claims that defendant Haley improperly denied him access to documents

23 from his central file during an Olson review.  This simply does not state a cognizable federal due

24 process claim.  The court is aware of no cases which hold that prisoners have a protected liberty

25 interest in being given copies of documents from their prison files.  While In re Olson may confer

26 a right under state law to review documents, that case does not create any protected liberty

1    interest in receiving copies of documents.  The court finds that refusal to provide copies of

2    documents in plaintiff's file does not meet either of the <u>Sandin</u> requirements.  Specifically, the

3    refusal neither restrained plaintiff's freedom nor imposed an atypical and significant hardship on

4    plaintiff in relation to the ordinary incidents of prison life.  <u>See Sandin</u>, 515 U.S. at 483-84.

5                          4.      Inmate Grievance Process

6            Plaintiff appears to assert that defendants Manuel and Prebula violated his due

7    process rights with respect to the way in which they processed his inmate grievances.  Plaintiff

8    cannot prevail because prisoners have no stand-alone due process right to the administrative

9    grievance process.  <u>See</u> <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988); <u>see also</u> <u>Ramirez v.</u>

10   <u>Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty interest entitling

11   inmates to a specific grievance process).

12       **D.    Retaliation Claims**

13           Prisoners retain a First Amendment right to petition the government through the

14   prison grievance process.  <u>See</u> <u>Bradley v. Hall</u>, 64 F.3d 1276, 1279 (9th Cir. 1995).  In order to

15   prevail on a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must establish that he was

16   retaliated against for exercising a constitutional right, and that the retaliatory action was not

17   related to a legitimate penological purpose, such as preserving institutional security.  <u>See</u> <u>Barnett</u>

18   <u>v. Centoni</u>, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).  In meeting this standard, the

19   prisoner must submit evidence establishing a specific link between the alleged retaliation and the

20   exercise of a constitutional right.  <u>See</u> <u>Pratt v. Rowland</u>, 65 F.3d 802, 807 (9th Cir. 1995);

21   <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner must also

22   establish that his constitutional right was actually chilled by the alleged retaliatory conduct.  <u>See</u>

23   <u>Resnick v. Hayes</u>, 213 F.3d 443, 449 (9th Cir. 2000).  Thus, the prisoner plaintiff must establish

24   the following in order to prevail on a claim of retaliation:  (1) prison officials took adverse action

25   against the inmate; (2) the adverse action was taken because the inmate engaged in protected

26   conduct; (3) the adverse action actually chilled the inmate's First Amendment rights; and (4) the

24

1   adverse action did not serve a legitimate penological purpose.  See Rhodes v. Robinson, 408 F.3d

2   559, 568 (9th Cir. 2005).  It is the prisoner's burden to establish that there were no legitimate

3   penological purposes motivating the actions of which he complains.  See Pratt, 65 F.3d at 808.

4   Finally, retaliation claims are evaluated in light of the deference generally accorded prison

5   officials.  See id. at 807.

6          Plaintiff claims that the conduct of defendants Caden and Aguirre was motivated

7   by their desire to retaliate against him because he had filed inmate grievances and lawsuits.  In

8   their motion for summary judgment, defendants argue:

9          Gaston's lawsuits and administrative grievances could not have
           been a substantial or motivating factor for Caden or Aguirre's conduct
10         because they were not even aware of his lawsuits and administrative
           grievances at the time.  (citation to undisputed facts omitted).  Gaston has
11         no definitive evidence proving otherwise.  (citations to undisputed facts
           omitted).  The only information that Gaston has that Aguirre and Caden
12         were aware of his legal activity was that he heard that Brommel had talked
           about his lawsuits while at CMF, that Brommel received a promotion after
13         his visit to CMF, . . . and from the information in Freeman and Howard's
           declarations.  (citations to undisputed facts omitted).  None of these things
14         establish that either Caden or Aguirre were aware of his lawsuits and
           administrative grievances.

15

16   Defendants also argue that plaintiff cannot establish that any of the conduct complained of did

17   not serve legitimate penological interests.  In his opposition to defendants' motion, plaintiff

18   states:

19         In the instant, plaintiff is informed and believe through information
           and belief that each casual connection of events that all seem to link
20         together by way of cause and sequence stems from (1) assisting other
           inmates at CMF with 602's and civil complaints, and (2) agent Brommel's
21         visit to CMF in 2000. . . .   [¶] Although plaintiff did not have any personal
           complaints with any of the present defendants at that time, plaintiff can
22         only draw inferences to the circumstantial evidence in totality of the
           circumstances, either defendants were upset at plaintiff because he was
23         litigating against a personal friend of theirs, or helping someone litigate
           against Caden or someone he knew. . . .

24

25   ///

26   ///

25

1    The court does not agree with defendants that ". . . none of [plaintiff's evidence]
2  establish that either Caden or Aguirre were aware of his lawsuits and administrative grievances."
3  Specifically, the court notes inmate Howard's declaration, in which he states that "Wood's [sic]
4  stated that Caden said Gaston was a prison snitch/rat. . . ."  Further, inmate Freeman stated in his
5  declaration that "Edward  J. Caden told me that he had an ass hole prisoner on the (CMF)
6  mainline who was a known snitch. . ." and that defendant Caden ". . . said prisoner Gaston . . .
7  was constantly filing frivolous lawsuits and causing trouble. . . ."  While defendants raise valid
8  objections to these declarations on the grounds they are hearsay and not based on personal
9  knowledge, they are prior statements inconsistent with defendant Caden's current position that he
10 did not know about plaintiff's lawsuits and inmate grievances.[7]  Thus, there is at least some basis
11 upon which a jury could conclude that defendant Caden knew about plaintiff's protected
12 activities.

13    However, the court must look to the conduct plaintiff alleges defendant Caden
14 engaged in that was retaliatory.  Specifically, plaintiff alleges that defendant Caden set up a
15 gladiator-style fight between plaintiff and inmate Woods in retaliation for having filed lawsuits
16 and grievances.  He also appears to claim that defendant Caden's denial of witnesses at the rules
17 violation hearing was motivated by retaliation.  As discussed above, the court finds that
18 defendant Caden did not in fact know of plaintiff's enemy concern with Woods.  Therefore, the
19 fight was not the result of any "set up" and defendant Caden's release of Woods was not the
20 result of any improper motive.  Further, as to witnesses, the court concludes that defendant
21 Caden had a valid reason for denying plaintiff's request – neither of the witnesses had any
22 personal knowledge.  For these reasons, the court agrees with defendants that plaintiff cannot
23 establish that defendant Caden retaliated against him.

24

25    [7]    While defendant Caden does not provide a declaration to this effect, his counsel
26 argue this point in the motion for summary judgment and, in any event, this is what defendant
   Caden will no doubt argue if the case were to proceed to a jury.

1       As to defendant Aguirre, defendants make much of plaintiff's deposition

2  testimony to the effect that defendant Aguirre has no knowledge of grievances or lawsuits filed

3  by plaintiff which mention her.  However, plaintiff is not in a position to testify as to what

4  defendant Aguirre may or may not have known.  This deposition testimony is speculation at best.

5  Only defendant Aguirre can testify as to what she did or did not know at the time.  Further,

6  defendant Aguirre's declaration is not clear as to her knowledge of plaintiff's grievances and

7  lawsuits.  Defendant Aguirre states:

8           At no time during Mr. Gaston's incarceration at CMK did I have
          reason to be concerned with the administrative grievances or lawsuits he
9           filed.  To the best of my knowledge none of his grievances or lawsuits,
          other than those pertaining to this case, even mentioned me.
10

11  From this, it is clear that some of plaintiff's grievances and at least one lawsuit named defendant

12  Aguirre.  It is not clear whether defendant Aguirre knew of other lawsuits and grievances.  While

13  defendant Aguirre states a lack of concern, this could mean either that defendant Aguirre was not

14  concerned because she was aware of no lawsuits or grievances, or because she was aware of them

15  but they did not raise any troubling issues.  Therefore, the court cannot say conclusively that

16  defendant Aguirre had no knowledge of plaintiff's protected activities.

17       However, as with defendant Caden, plaintiff cannot establish the essential element

18  of his retaliation claim that defendant Aguirre's conduct did not serve some legitimate

19  penological purpose.  Plaintiff alleges that defendant Aguirre retaliated against him by placing

20  him in administrative segregation in September 2001.  However, plaintiff conceded at his

21  deposition that defendant Aguirre placed him in administrative segregation based on a credible

22  threat to his safety.  Therefore, by plaintiff's own admission, the September 2001 administrative

23  segregation placement served a legitimate penological purpose – to protect plaintiff from a

24  possible danger to his safety.

25  / / /

26  / / /

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Defendants' motion for summary judgment (Docs. 97, 98, 99, 100, 101, 102, and 103) be granted;

2.      Defendants' motion to strike (Doc. 127) plaintiff's cross-motion for summary judgment be granted;

3.      Plaintiff's December 26, 2007, filing be considered only to the extent it is an opposition to defendants' motion;

4.      Defendants' request for judicial notice (Doc. 134) be denied; and

5.      The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 5, 2008

_____
CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

28